FILED
John E. Triplett, Acting Clerk
United States District Court

By MGarcia at 10:15 am, Jul 28, 2020

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

QUINTAVIOUS LUNDY,

        Plaintiff,

    v.

COMMISSIONER HOMER BRYSON, et al.,

        Defendants.

CIVIL ACTION NO.: 5:16-cv-71

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on Defendants' Motion for Summary Judgment.   Doc. 50.   Plaintiff has filed a Response, docs. 60, 61, and Defendants filed a Reply and Response to Plaintiff's Statement of Material Facts, docs. 62, 63.   Plaintiff asserts a claim in this action under 42 U.S.C. § 1983, alleging Defendants violated his procedural due process rights under the Fourteenth Amendment.   Doc. 9-1 at 2–3.   Defendants have shown they are entitled to judgment as a matter of law based on the undisputed material facts, and Plaintiff has not demonstrated any genuine issue of material fact.   Therefore, I **RECOMMEND** the Court **GRANT** Defendants' Motion for Summary Judgment, enter judgment in Defendants' favor, and **DISMISS** Plaintiff's Complaint.   I also **RECOMMEND** the Court **DIRECT** the Clerk of Court to enter the appropriate judgment of dismissal and **CLOSE** this case and **DENY** Plaintiff *in forma pauperis* status on appeal.

## BACKGROUND

### I.      Plaintiff's Allegations and Procedural History

Plaintiff filed this action contesting certain conditions of his confinement at Ware State Prison ("WSP").   Doc. 1.   Specifically, Plaintiff contends Defendants violated his constitutional rights in relation to his placement in Tier II administrative segregation ("Tier II") at WSP.[1]   Id. at 5.

The Magistrate Judge conducted a frivolity review of Plaintiff's Complaint, and the Court dismissed several of Plaintiff's asserted claims and named Defendants.   Doc. 15.   Plaintiff's only surviving claims after frivolity review were his procedural and substantive due process claims for injunctive relief and nominal damages against Defendants Cox, Lowe, Steedly, and Dozier.[2]   Id.   On January 3, 2017, Defendants moved to dismiss Plaintiff's Complaint for failure to state a claim upon which relief may be granted, which the Court granted in part and denied in part.   Docs. 22, 39.   Specifically, the Court dismissed Plaintiff's substantive due process claim but did not dismiss Plaintiff's Fourteenth Amendment procedural due process claim against Defendants Cox, Lowe, Steedly, and Dozier, seeking injunctive relief and nominal damages.[3]   Doc. 39.   Plaintiff's procedural due process claim challenges the procedures Defendants used to retain Plaintiff on Tier II at WSP.

---

[1]      Generally, Plaintiff alleges Defendants improperly assigned him to Tier II, failed to conduct proper 90-day reviews, and prevented Plaintiff from appealing his continued assignment to Tier II. Doc. 1.   As explained below, Plaintiff's claims fail as a matter of law because he has not shown a protected liberty interest.   Therefore, it is unnecessary to describe in detail Plaintiff's complaints about Defendants' actions.

[2]      Plaintiff originally named Homer Bryson as a Defendant.   Doc. 1.   However, effective December 1, 2016, Gregory Dozier replaced Homer Bryson as Commissioner of the Georgia Department of Corrections.   Doc. 22 at 1 n.1.   By operation of law, Defendant Dozier automatically replaced Bryson as a Defendant in this matter.   Fed. R. Civ. P. 25(d).

[3]      Plaintiff, in requesting injunctive relief, asks the Court to order Defendants to remove him from the Tier II Unit and place him in general population.   Doc. 1 at 3.

The parties completed discovery, and Defendants have now moved for summary judgment.  Doc. 50.  Defendants make three arguments in favor of summary judgment: (1) Plaintiff's procedural due process rights were not violated because Plaintiff has no liberty interest in being held with the general population as opposed to in Tier II, and Plaintiff was afforded sufficient due process in his assignment to Tier II; (2) Defendants are entitled to qualified immunity; and (3) Plaintiff's claims for injunctive relief are moot, as Plaintiff has been released from Tier II segregation and is now housed in general population.  Doc. 50-1.

## II.    Undisputed Material Facts

In order to resolve Defendants' Motion for Summary Judgment, the Court must consider the material facts pertaining to the conditions of Plaintiff's assignment to Tier II at WSP relative to the conditions of ordinary prison life.

It is important to note at the outset that Plaintiff made various allegations about the conditions of Tier II in his Complaint, but the Court must not consider those unsworn statements for the purposes of summary judgment.  See Chambliss v. Buckner, 804 F. Supp. 2d 1240, 1248 (M.D. Ala. 2011) ("Allegations in an unsworn complaint are not evidence for purposes of summary judgment and, thus, cannot be considered." (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986))).

Defendants submitted a Statement of Material Facts ("Defendants' SMF") in support of their Motion for Summary Judgment, in accordance with the Federal Rule of Civil Procedure 56 and Local Rule 56.1.  Doc. 50-2.  Defendants' SMF includes, among other things, a general description of the Tier II program, conditions in Tier II and its various Phases, the procedures related to assignment to and transition through Tier II, and Plaintiff's administrative segregation assignment history.  Id.  Defendants' SMF is supported by Plaintiff's deposition and relevant

deposition exhibits, doc. 50-3, the Declaration of Ahmed Holt, Georgia Department of

Corrections Deputy Director of Field Operations, doc. 50-4, and a document memorializing

Plaintiff's initial assignment to Tier II in May 2014, doc. 50-5.

Plaintiff did not respond directly to Defendants' SMF but instead submitted his own

Statement of Facts ("Plaintiff's SMF").   Doc. 61-1.   In his SMF, Plaintiff asserts many of the

same facts asserted in Defendants' SMF (demonstrating the facts are undisputed), and he fails to

controvert other facts in Defendants' SMF with any citations to the record, or at all.[4]   Id.

Defendants responded to Plaintiff's SMF, demonstrating whether the facts alleged in Plaintiff's

SMF are disputed, including citations to the record where such facts are disputed.   Doc. 63.

In reviewing the parties' respective statements of material facts and record citations

where provided, the Court concludes the facts regarding the conditions of Tier II assignment

(and the conditions Plaintiff experienced while assigned to Tier II at WSP) are undisputed.

Both parties rely on the Tier II Conditions and Privileges Graph, doc. 50-3 at 10; doc. 61-2,

which is a chart published by Georgia Department of Corrections discussing the various

conditions and privileges of Tier II assignment.   During Plaintiff's deposition, he testified he

received the privileges detailed in the Tier II Conditions and Privileges Graph:

Q:   Mr. Lundy, I'm going to show you what we've marked as Defendant's [sic]
Exhibit Number 2.   Do you recognize that document?

A:   Yes, ma'am.

Q:   I believe you submitted that as an exhibit with your complaint, correct?

A:   Yes, ma'am.

---

[4]      Plaintiff did not support his Statement of Material Fact with citations to the record, as he was
required to do, or show by affidavit or declaration that any facts were unavailable to him.   Fed. R. Civ. P.
56(c)(1), (d).   The Court is sympathetic to challenges pro se litigants face, but such litigants are still
required to conform to procedural rules.   United States v. Theodore, 780 F. App'x 769, 771 (11th Cir.
2019).

> Q:      Could you tell us generally what this document is[?]
>
> A:      The property allowance of all the inmates on the Tier 2 program.
>
> Q:      Okay.   So these are sort of the privileges you get or don't get as you move through the phases?
>
> A:      Yes, ma'am.
>
> Q:      All right.   When moving through the phases, did you receive these privileges?
>
> A:      Yes, ma'am.

Doc. 50-3 at 4.   Id.   Mr. Holt's declaration provides additional details about the conditions and privileges associated with Tier II and, by comparison, general population at WSP.   Doc. 50-4. Plaintiff does not dispute any of Mr. Holt's testimony.   Doc. 61.   Therefore, the following facts regarding the Tier II Program, Plaintiff's administrative segregation assignment history, the conditions Plaintiff experienced while assigned to Tier II at WSP, and the conditions of general population at WSP are all undisputed.[5]

## A.      Georgia Department of Corrections' Tier II Program

The Georgia Department of Corrections "uses the Tier Segregation Program to provide a managed stratification-oriented, incentive-based pathway for certain offenders to successfully transition from segregation to lower levels of security as the demonstrate appropriate behavior and program compliance."   Doc. 50-2 at 1–2.   The Tier Program is not punitive; the program's purpose is "to protect staff, offenders, and the public from offenders who commit certain actions, or who pose a serious threat to the safety and security of the institutional operation."   Id. at 2.

---

[5]      Stated another way, Plaintiff agrees the conditions he experienced in Tier II at WSP were identical to the conditions described in the Tier II Conditions and Privileges Graph, and Plaintiff does not contend he suffered any more severe hardship than the standard conditions of Tier II.   Plaintiff, however, argues the standard conditions of Tier II constitute an atypical and significant hardship relative to ordinary prison life, doc. 61 at 2, while Defendants contend they do not, doc. 50-1.

Inmates may be assigned directly to Tier II by a "Classification Committee" made up of officials at the facility where the inmate is housed. Id. The Classification Committee conducts 90-day reviews of inmates assigned to Tier II and makes recommendations about inmates' progress through the program. Id. Tier II consists of four "Phases": Phase 1, Phase 2, Phase 3, and Phase 3+. Id. at 3. Phase 1 is the most restrictive, and Phase 3+ is the least restrictive. Id. Inmates assigned to Tier II are typically first assigned to Phase 1. Id. Tier II inmates may progress through the Phases based on behavior and ability to adjust to the Program. Id. Inmates may move up or down through the Phases. Id. Once an inmate has successfully completed all Phases, the inmate "is generally eligible for new housing assignment, up to and including a return to general population." Id.

**B.    Plaintiff's Administrative Segregation Assignment History**

In 2012, Plaintiff was "validated" as a member of the Goodfellas gang.[6] Doc. 50-2 at 8. From May 7, 2014 to September 29, 2014, Plaintiff was incarcerated at Valdosta State Prison. Id. Based on this gang affiliation, prison officials determined Plaintiff was a security threat and placed him in Tier II, an administrative segregation assignment in the Georgia prison system.[7] Id. Plaintiff was then transferred to WSP on September 29, 2014. Id. It appears Plaintiff has remained at WSP since 2014.

Upon his arrival at WSP, Plaintiff was assigned to Tier II, Phase 1 based on his gang affiliation. Id. at 8. Plaintiff transitioned to Tier II, Phase 2 in December 2014, and to Tier II,

---

[6]    The record is somewhat unclear as to where Plaintiff was housed when the validation was made or who made that determination. But the parties agree that the validation occurred in 2012. Plaintiff's "Movement History" indicates he was either at Georgia Diagnostic Classification Prison or Burruss Correctional Training Center in 2012. Doc. 50-3 at 9.

[7]    Again, the record is somewhat unclear as to when Plaintiff was first assigned to Tier II due to his gang affiliation, but it is undisputed that Plaintiff was assigned to Tier II while at Valdosta State Prison.

Phase 3 in March 2015.   Id.   In June 2015, Plaintiff transitioned to Tier II, Phase 3+ and

remained on Phase 3+ until May 2018, when he was assigned to the Tier I program.   Id. at 9.

Sometime between May 2018 and April 2019, Plaintiff was moved from Tier I to general

population and remains in general population.   Id.

 Plaintiff's claims in this action concern Plaintiff's continued assignment to Tier II at

WSP between September 2014 and May 2018.   Doc. 1.   Plaintiff successfully completed the

Phases 1, 2, and 3 of the Tier II Program at WSP but was placed on an extended phase of Tier II,

referred to as Phase 3+, and remained on Phase 3+ for an extended period of time (i.e., from June

2015 to May 2018, approximately 35 months total) due to his gang affiliation.   Id.

 **C. Conditions of Tier II and General Population at WSP**

 To resolve Defendants' Motion for Summary Judgment, the Court must assess the

conditions and privileges Tier II inmates experience relative to conditions and privileges general

population inmates experience.   As explained above, Plaintiff agrees the conditions he

experienced while in Tier II at WSP were identical to the conditions described in the Georgia

Department of Corrections' Tier II Conditions and Privileges Graph.   Moreover, Plaintiff has

not disputed Mr. Holt's testimony regarding Tier II conditions relative to general population

conditions.   Thus, the Court describes the Tier II conditions as set forth in the Tier II Conditions

and Privileges Graph and compares those to the undisputed conditions experienced by general

population inmates.

 *1. Commissary Access and Personal Property.*

 At the commissary, inmates in Phase 1 may only purchase legal supplies, including

stamps, envelopes, paper, and pens, for up to $15.00 per week.   Doc. 50-2 at 4.   Phase 2

inmates may purchase the aforementioned legal and writing materials, plus health and hygiene

products, for up to $15.00 per week.  Id.  Phase 3 inmates may purchase at the commissary all of the Phase 1 and Phase 2 products, along with food items, for up to $30.00 per week.  Id. Phase 3+ inmates may purchase Phase 1 and Phase 2 products, along with food items, for up to $40.00 per week.  Id.  Inmates in general population may purchase up to $60.00 per week from the commissary in food, hygiene, and other supplies.  Id.  When a Tier II inmate reaches Phase 3+, he receives back all personal property that was confiscated upon his placement in Tier II; Phase 3+ inmates have the same personal property privileges as general population inmates.  Id. at 5.  Additionally, Phase 3+ inmates may receive GDC clothing and holiday packages like inmates in general population.  Id.

### 2.    Mail.

All general population and Tier II inmates receive personal and legal mail and may mail out an unlimited amount of personal mail at their own expense.  Id. at 4.  However, inmates in Phase 1 and Phase 2 may not receive magazines, newspapers, and books—excepting those considered legal or religious—until the inmate progresses to Phase 3 and Phase 3+.  Id.  In comparison, general population inmates may possess a combination of eight newspapers, magazines, and books at any one time.  Id.

### 3.    Phone Calls.

Tier II inmates in Phase 1 receive one 15-minute phone call per month; at Phase 2, inmates are allowed two 15-minute phone calls per month; and Phase 3 and Phase 3+ inmates may make three 15-minute phone calls per month, all at their own expense.  Id. at 5.  In comparison, general population inmates may make unlimited 15-minute phone calls after 4:00 p.m. each day at their own expense.  Id.

    *4.*    *Visitation.*

Tier II inmates in Phase 1 are allowed one, two-hour "no-contact" visit each month; two, two-hour "no-contact" visits per month in Phase 2; and three, two-hour "no-contact" visits each month if the inmate is in Phase 3 or Phase 3+.   Doc. 50-2 at 5.   Only two visitors are allowed. Id.   In comparison, general population inmates have unrestricted visitation from 9:00 a.m. to 3:00 p.m. on Saturday and Sunday.   Id.

    *5.*    *Hygiene.*

All inmates assigned to Tier II have the opportunity for personal hygiene three times per week.   Id. at 3.   No information was provided regarding how Tier II inmates' access to hygiene compares to general population inmates' access.

    *6.*    *Library Access*

Tier II Phase 1 and Phase 2 inmates are only permitted legal materials from the prison law library; Phase 3 and Phase 3+ inmates may access general and legal titles from the prison's general and law libraries.   Id. at 6.   To access library materials, Tier II inmates must make a request in writing, and the books are delivered directly to each inmate's cell.   Id.   General library books are delivered once a week, while legal materials are delivered twice a week.   Id. General population inmates, in comparison, have direct access to both the general and law library during scheduled hours.   Id.

    *7.*    *Recreation.*

All Tier II inmates receive five hours of outdoor recreation per week.   Id.   The Tier II inmates are permitted recreation five days per week (Monday through Friday) for one hour each day in an administrative segregation pen, unless there is inclement weather or a prison-wide

lockdown.   Id.   To compare, general population inmates receive three hours of outdoor exercise one day a week, unless there is inclement weather or a prison-wide lockdown.   Id.

### 8.   *Educational Programs.*

Tier II inmates can participate in some educational programs but not vocational courses. Id.   The Georgia Department of Corrections offers Tier II inmates courses called "Self-Discovery," "Choices and Changes," and "Turning Points," which are taught by Department of Corrections' counselors.   Doc. 50-2 at 6.   Inmates in Phase 1 take the courses in their cells; inmates in Phase 2 and Phase 3 take the courses in their cells or in restricted small groups as available; and Phase 3+ inmates take the courses in small groups and may, if available, access a separate class called "Life Skills."   Id. at 6–7.   Inmates assigned to general population have access to vocational courses and educational courses.   Id. at 7.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.   However, there must exist a conflict in substantial evidence to pose a jury question."   Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).   "If the evidence [produced by the nonmoving party] is merely colorable or is not significantly probative summary judgment must be granted.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

The moving party bears the burden of establishing that there is no genuine dispute as to

any material fact and that he is entitled to judgment as a matter of law.   See Williamson Oil Co.,

Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).   Specifically, the moving

party must identify the portions of the record which establish that there are no "genuine

dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."

Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).   When the nonmoving party would

have the burden of proof at trial, the moving party may discharge his burden by showing that the

record lacks evidence to support the nonmoving party's case or that the nonmoving party would

be unable to prove his case at trial.   See id. (citing Celotex v. Catrett, 477 U.S. 317, 322–23

(1986)).   In determining whether a summary judgment motion should be granted, a court must

view the record and all reasonable inferences that can be drawn from the record in a light most

favorable to the nonmoving party.   Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County,

630 F.3d 1346, 1353 (11th Cir. 2011).

## DISCUSSION

### I.   Plaintiff's Procedural Due Process Claim

Defendants seek summary judgment on Plaintiff's procedural due process claim on three

grounds: (1) Plaintiff's procedural due process rights were not violated because Plaintiff has no

liberty interest in being held with the general population as opposed to in Tier II, and Plaintiff

was afforded sufficient due process in his assignment to Tier II; (2) Defendants are entitled to

qualified immunity; and (3) Plaintiff's claims for injunctive relief are moot, as Plaintiff has been

released from Tier II segregation and is now housed in general population.   Doc. 50-1.

Plaintiff does not directly respond to many of Defendants' arguments and makes no

attempt to establish a genuine dispute regarding any material fact.   Rather, Plaintiff reasserts his

original challenges to his placement in the Tier Segregation Program, asserting he had not

committed any "overt acts of misconduct," and nothing—other than his alleged Goodfellas membership—supported the decision to place him in segregation.   Doc. 61-1 at 1. Additionally, Plaintiff claims the Classification Committee failed to follow the Standard Operating Procedures ("SOP") IIB09-0003, because not all members of the Classification Committee were present at every 90-day review, and Defendant Steedly denied him an assignment appeal form at their June 3, 2016 meeting.   Doc. 61 at 2.   Finally, Plaintiff contends the Tier II Conditions and Privileges Graph, doc. 61-2, proves that Tier II segregation imposes an atypical and significant hardship relative to the ordinary incidents of prison life.   Id. at 2–3.

Section 1983 claims for denial of procedural due process require three elements: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process."   Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003).   "Determining whether one was deprived of liberty presents a unique challenge with prisoners, who are already deprived of their liberty in the ordinary understanding of the word." Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999); see also Jacoby v. Baldwin County, 835 F.3d 1338, 1346 (11th Cir. 2016) (citing Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999)).   In Sandin v. Conner, the United States Supreme Court rejected tests which determined categorical liberty interests through analysis of the language and structure of the state's laws and policies.   515 U.S. 472, 483–85 (1995).   Rather, the Supreme Court held that, in evaluating whether a due process liberty interest exists, courts should examine the conditions of confinement, not the language or structure of the state law or the prison's grievance policies.   Id.

The Supreme Court has identified two situations in which a prisoner can be further deprived of his liberty such that due process is required.   Kirby, 195 F.3d at 1290–91.   First, there is a protected due process liberty interest "when a change in the prisoner's conditions of

confinement is so severe that it essentially exceeds the sentence imposed by the court."[8]   Id.; Sandin, 515 U.S. at 484.   Second, a state-created liberty interest may arise "when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"   Kirby, 195 F.3d at 1291 (quoting Sandin, 515 U.S. at 484); see also Smith v. Deemer, 641 F. App'x 865, 868 (11th Cir. 2016) ("Atypical and significant hardships must also be severe relative to regular prison."); Jacoby, 835 F.3d at 1346–47 ("This test examines the hardship imposed on the inmate relative to the 'basic conditions' of prison life."); Magluta v. Samples, 375 F.3d 1269, 1276 (11th Cir. 2004).

The threshold issue to resolving Defendants' Motion for Summary Judgment is whether Plaintiff held any state-created liberty interest in avoiding assignment to Tier II at WSP. Doc. 50 at 9.   If Plaintiff did not hold such a liberty interest, there is no need to assess the adequacy of the procedures used to place Plaintiff on Tier II and keep him there because no specific process was constitutionally required.

A state-created liberty interest in avoiding segregated confinement may exist where the conditions of the segregated confinement constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life . . . ."   Quintanilla v. Bryson, 730 F. App'x 738, 743 (11th Cir. 2018) (quoting Sandin, 515 U.S. at 484 ); Turner v. Warden, GDCP, 650 F. App'x 695, 700 (11th Cir. 2016); Wallace v. Hamrick, 229 F. App'x 827, 830 (11th Cir. 2007) (noting the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those

---

[8]   Plaintiff does not argue the conditions he experienced on Tier II at WSP "essentially exceeded the sentence imposed by the court."   Plaintiff only argues assignment to Tier II constituted an atypical and significant hardship.

conditions themselves 'in relation to the ordinary incidents of prison life.'" (quoting Wilkinson v. Austin, 545 U.S. 209, 223 (2005))).   "Confinement to administrative segregation, under conditions substantially similar to those experienced by the general population of the prison," however, "does not implicate liberty interests . . . ."   Al-Amin v. Donald, 165 F. App'x 733, 738 (11th Cir. 2006).   Thus, courts must determine whether the conditions the plaintiff experienced in segregated confinement present such a dramatic unfavorable departure from the basic conditions of an inmate's sentence that the plaintiff has an independent liberty interest in their avoidance.   Wilkinson v. Austin, 545 U.S. 209, 223–24 (2005) (citing Sandin, 515 U.S. at 485).

   As explained above, the conditions of Tier II and general population at WSP that Plaintiff experienced are undisputed.   The Court, therefore, considers whether the Tier II conditions present atypical and significant hardships relative to general population conditions at WSP.

   In assessing the severity of the hardships faced by inmates in segregated confinement, the Court looks first to the seminal Supreme Court case, Wilkinson.   In Wilkinson, the Court held that prisoners had a liberty interest in avoiding confinement in a "Supermax" prison because the conditions there constituted an atypical and significant hardship.   Id. at 224.   Specifically, almost all human contact was prohibited, including conversation between cells; a light in the cell was on for 24 hours per day; exercise was only allowed in a small indoor room; confinement was indefinite and was only reviewed annually; and placement in the Supermax facility disqualified otherwise eligible inmates from parole consideration.   Id. at 223–24.   The Supreme Court explained that, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context."   Id. at 224.

   The Eleventh Circuit Court of Appeals considered a claim of "atypical and significant

hardship" in Turner v. Warden, GDCP, 650 F. App'x 695 (11th Cir. 2016).   In Turner, the

prisoner-plaintiff asserted a procedural due process claim concerning his assignment to Georgia

State Prison's SMU (Special Management Unit).[9]   The court concluded the SMU conditions

were similar to those in the general population, noting the following:

> Plaintiff regularly received meals and five hours of outdoor recreation time each
> week.   He was allowed to shower three times per week.   Unless he was in the
> most restrictive wing, he was allowed to have his personal property and in some
> wings even had a television in his cell.   Plaintiff was not denied human contact
> and even received visitation on the weekends.

Id. at 700.   The court held there was "no combination of facts demonstrating that [plaintiff's]

incarceration in the SMU (special management unit) imposed an atypical and significant

hardship compared to ordinary prison."   Id. at 701.   As a result, the court held the plaintiff had

no state-created liberty interest in avoiding confinement in the SMU and affirmed the trial

court's grant of summary judgment to defendant on the claim.   Id.

In another Eleventh Circuit opinion, the court discussed conditions of confinement in

another Georgia prison's SMU and assumed, for the sake of argument, that the conditions

imposed an atypical and significant hardship.   DelGiudice v. Primus, 679 F. App'x 944, 948

(11th Cir. 2017).   There, the plaintiff alleged, in response to a motion to dismiss, the following:

> [H]e had been in SMU for over three years; the SMU cells were 60 square feet; he
> was limited to recreation two times a week, showers three times a week, a phone
> call once a month, and cell cleaning once a week; he was prohibited from
> attending religious or educational programs, and from associating with other
> prisoners; and he was deprived of an adequate law library and legal books.

Id.   The DelGiudice court assumed, without deciding, that the allegations stated an atypical and

significant hardship relative to general population, but, ultimately, affirmed the trial court's

---

[9]      Notably, the SMU (known as Tier III) is the most restrictive level of incarceration in the Georgia
prison system and is more restrictive than Tier II.   Doc. 50-2 at 2.

dismissal of the claim because plaintiff was afforded the minimum requirements of due process in his segregation assignment.[10]   Id.

Considering the conditions presented in Turner and DelGiudice, and the Eleventh Circuit's discussion of those conditions, the undisputed evidence in this case demonstrates that the conditions of each phase of Tier II at WSP, as experienced by Plaintiff, were not atypical and significant relative to the general population conditions.   Importantly, it is undisputed Plaintiff was assigned to Phase 3 or Phase 3+ (the least restrictive phases) for the vast majority of his time in Tier II.   During his time on Tier II, Plaintiff received regular meals and five hours of outdoor recreation time every week, spending one hour outside each day.   He was not allowed to keep all of his personal property, but it was returned to him as he progressed through the phases of Tier II, and once he was assigned to Phase 3+, Plaintiff had the same rights to personal property as in general population.   Plaintiff could interact with other humans through phone calls and visitation—though his visits were "no contact" visits—and he had a roommate throughout his time on Tier II.   Furthermore, Plaintiff was permitted to purchase legal supplies, and, beyond the most restrictive phase of segregation, he could purchase hygiene and food items.   At the least restrictive phase, Plaintiff received all his personal property back, along with holiday packages. Plaintiff could always receive personal and legal mail and, upon progression to Phase 3 and beyond, he could receive books, magazines, and newspapers.   Although Plaintiff could not directly visit the general and law library, he could request legal materials at all phases of Tier II

---

[10]      It is worth noting the DelGiudice plaintiff's three years in segregation may have impacted the atypical and significant hardship analysis.   679 F. App'x at 948.   Indeed, the Eleventh Circuit notes "[b]oth the period of time and the severity of the hardships must be taken into consideration.   Id. at 947 (citing Magluta v. Samples, 375 F.3d 1269, 1282 (11th Cir. 2004)); see also Conner v. Allen, No. 6:17-CV-10, 2020 WL 2104943, at *12 (S.D. Ga. May 1, 2020) (discussing the significance of the duration of administrative segregation in assessing whether a hardship is atypical and significant), report and recommendation adopted, 2020 WL 3163292 (S.D. Ga. June 12, 2020).

and could access general titles upon progression to Phase 3 and Phase 3+.   Likewise, although

Plaintiff could not attend vocational courses, he was offered educational courses put on by GDC

counselors.   The conditions Plaintiff experienced are far less severe than the conditions

described in Wilkinson in DelGiudice.   Plaintiff, in this case, was allowed visitation,

conversation with other inmates, and outdoor recreation.   Plaintiff received more frequent

recreation and phone calls than the plaintiffs in Wilkinson and DelGiudice and had access to

educational programs and the law library.   As in Turner, Plaintiff fails to demonstrate a

combination of factors supporting his claim that his incarceration in Tier II administrative

segregation imposed an atypical and significant hardship compared to the general population.

See also Quintanilla v. Bryson, No. 6:17-cv-4, 2020 WL 1441405, at *9 (S.D. Ga. Mar. 20,

2020) (granting summary judgment to defendant where undisputed material facts demonstrated

the conditions plaintiff experienced while on Tier II at Georgia's Smith State Prison did not

constitute an atypical and significant hardship relative to the incidents of ordinary prison life);

Maddox v. Owens, No. 5:15-cv-36, 2018 WL 1513671, at *8 (M.D. Ga. Mar. 27, 2018) ("The

Court finds there is no material issue as to whether the conditions Maddox faced in [Tier II at]

Macon State Prison, taken together, do not rise to the level of an 'atypical and significant

hardship within the correctional context.'").   Consequently, Plaintiff had no liberty interest in

avoiding confinement in Tier II.

Plaintiff cites three cases in his Response regarding atypical and significant hardships,

but the cases are non-binding and not persuasive.   Doc. 61 at 4 (citing Koch v. Lewis, 216 F.

Supp. 2d 994 (D. Ariz. 2001); Brown v. Plaut, 131 F.3d 163 (D.C. Cir. 1997); Hatch v. Dist. of

Columbia, 184 F.3d 846 (D.C. Cir. 1999)).   The Koch case, 216 F. Supp. 2d at 1000–1002, is

factually distinct from this case.   In Koch, the plaintiff's conditions of confinement were

significantly more extreme in both degree and duration.[11]   Moreover, Koch was vacated on

other grounds in Koch v. Schriro, 399 F.3d 1099, 1101 (9th Cir. 2005).   The Brown opinion,

131 F.3d at 170, is similarly unhelpful.   In Brown, the court elected not to decide whether the

plaintiff's conditions of confinement presented an atypical and significant deprivation and

remanded the case for a determination of whether the plaintiff—assuming he had a liberty

interest in avoiding administrative segregation—received constitutionally sufficient due process.

Finally, the Hatch case, 184 F.3d at 854–58, adopts a different standard than that employed by

the Eleventh Circuit for determining whether segregated confinement imposes an atypical and

significant hardship on an inmate and is, therefore, inapposite to this case.[12]   See Whitsett v.

Cannon, 139 F. Supp. 3d 1293, 1300 (M.D. Fla. 2015) (discussing difference between standard

articulated in Hatch and approach utilized in the Eleventh Circuit).

---

[11]      In Koch, the plaintiff was confined to his cell for 165 out of 168 hours per week; took all meals alone in his cell; was only allowed out of his cell for three hours per week and was placed in restraints and allowed to walk 20 feet down the hall in one direction for an eight-minute shower and ten feet down the hall in the other direction to the empty exercise room; and plaintiff's only view of the outside world was through the mesh roof of the recreation room, and prior to his trial, he had not seen the horizon or the night sky for more than five years.   216 F. Supp. 2d at 1000.   Furthermore, the plaintiff was not allowed to interact with other prisoners or to participate in any educational, vocational, or employment activities. Id.   His only face-to-face contact was with prison officials, and any visitor had to remain behind a plate glass window or wear a bulletproof vest and protective eye goggles.   Id.   Indeed, the plaintiff's trial provided his first opportunity to initiate voluntary, physical contact with another human being in over five years' time.   Id. at 1001.   Additionally, the plaintiff was slated to remain in such conditions indefinitely. Id. at 1001.

[12]      Hatch holds that a constitutionally protected liberty interest concerning segregated confinement arises only when the deprivation "imposes an 'atypical and significant' hardship on an inmate in relation to the most restrictive confinement conditions that prison officials . . . routinely impose on inmates serving similar sentences."   184 F.3d at 856.   Thus, under Hatch, courts consider the conditions of confinement relative to administrative segregation, rather than the general population, along with the duration relative to the length of administrative segregation routinely imposed on prisoners serving similar sentences.   Id.   The Court does not have the information necessary to make such comparisons, nor is it required to do so.   Moreover, such a standard would likely be even more favorable to Defendants.

Based on the material facts before the Court, on which there is no genuine dispute, Defendants are entitled to summary judgment.   It is unnecessary to address the remaining portions of Defendants' Motion for Summary Judgment.[13]   There is no issue left for a finder of fact to consider in this case and, accordingly, I **RECOMMEND** the Court **GRANT** Defendants' Motion for Summary Judgment, doc. 50, and **DISMISS** Plaintiff's Complaint.

## II.   Leave to Appeal *in Forma Pauperis*

Should the Court adopt my recommendation and grant Defendants' Motion for Summary Judgment, the Court should also deny Plaintiff leave to appeal *in forma pauperis*.   Though Plaintiff has not yet filed a notice of appeal, it would be appropriate to address these issues in the Court's order of dismissal.   Fed. R. App. P. 24(a)(3) (trial court may certify that appeal is not taken in good faith "before or after the notice of appeal is filed").

An appeal cannot be taken *in forma pauperis* if the trial court certifies that the appeal is not taken in good faith.   28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3).   Good faith in this context must be judged by an objective standard.   Busch v. County of Volusia, 189 F.R.D. 687, 691 (M.D. Fla. 1999).   A party does not proceed in good faith when he seeks to advance a frivolous claim or argument.   See Coppedge v. United States, 369 U.S. 438, 445 (1962).   A claim or argument is frivolous when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless.   Neitzke v. Williams, 490 U.S. 319, 327 (1989); Carroll v. Gross, 984 F.2d 392, 393 (11th Cir. 1993).   An *in forma pauperis* action is frivolous and not brought in good faith if it is "without arguable merit either in law or fact."   Napier, 314

---

[13]      The Court declines to address Defendants' remaining three arguments: (1) that Plaintiff received all of the process he was due regarding his continued Tier II assignment; (2) Defendants are entitled to qualified immunity; and (3) Plaintiff's request for injunctive relief is moot.   However, the Court notes these arguments are supported by controlling authority and evidence of record, and Plaintiff has failed to rebut any of Defendants' additional arguments.

F.3d at 531; see also Brown v. United States, Nos. 407CV085, 403CR001, 2009 WL 307872, at

*1–2 (S.D. Ga. Feb. 9, 2009).   Based on the above analysis of Plaintiff's action and Defendants'

Motion for Summary Judgment, there are no non-frivolous issues to raise on appeal, and an

appeal would not be taken in good faith.   Thus, the Court should **DENY** Plaintiff *in forma*

*pauperis* status on appeal as to any dismissed claims.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** the Court **GRANT** Defendants' Motion for

Summary Judgment, **DENY** Plaintiff's claim for injunctive relief, and **DISMISS** Plaintiff's

Complaint.   I also **RECOMMEND** the Court **DIRECT** the Clerk of Court to enter the

appropriate judgment of dismissal and **CLOSE** this case and **DENY** Plaintiff *in forma pauperis*

status on appeal.

The Court directs any party seeking to object to this Report and Recommendation to file

specific written objections within 14 days of the date on which this Report and Recommendation

is entered.   Any objections asserting that the Magistrate Judge failed to address any contention

raised in the Complaint must also be included.   Failure to do so will bar any later challenge or

review of the factual findings or legal conclusions of the Magistrate Judge.   See 28 U.S.C.

§ 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985).   A copy of the objections must be served

upon all other parties to the action.   The filing of objections is not a proper vehicle through

which to make new allegations or present additional evidence.

Upon receipt of Objections meeting the specificity requirement set out above, a United

States District Judge will make a de novo determination of those portions of the report, proposed

findings, or recommendation to which objection is made and may accept, reject, or modify in

whole or in part, the findings or recommendations made by the Magistrate Judge.   Objections

not meeting the specificity requirement set out above will not be considered by a District Judge.

A party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit.   Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

      **SO REPORTED and RECOMMENDED**, this 28th day of July, 2020.

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA